UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| **BEHNAZ FAHIMIPOUR, ET AL.,** <br>     **Plaintiffs** | **CIVIL ACTION** |
| **VERSUS** | **NO. 21-2222** |
| **UNITED PROPERTY & CASUALTY INSURANCE COMPANY,** <br>     **Defendant** | **SECTION: "E" (1)** |

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

This is a homeowner's insurance policy coverage dispute arising out of Hurricane Zeta, which made landfall in South Louisiana on October 28, 2020.[1] Plaintiffs Behnaz Fahimipour and Mohamad Fahimipour (wife and husband) allege extensive damage to their property located at 57 Chateau Palmer Drive, Kenner, Louisiana ("Property") caused by Hurricane Zeta. Plaintiffs seek judgment that United Property & Casualty Insurance Company ("UPC" or "Defendant") breached the contract of insurance allegedly provided to them and owes them $91,664.22 for property damages and repairs Plaintiffs made to the Property as a result of Hurricane Zeta.[2] Additionally, Plaintiffs seek judgment that UPC violated La. R.S. 22:1892 and La. R.S. 22:1973 with respect to Plaintiffs' insurance claim and, accordingly, Plaintiffs are entitled to extra-contractual damages in the amounts of $45,000 for penalties and $18,000 in attorney fees.[3] Plaintiffs also seek court costs from UPC.[4]

---

[1] R. Doc. 56 at ¶ 2 (amended joint stipulation of facts).
[2] R. Doc. 51 at p. 9 (Plaintiffs' proposed judgment).
[3] *Id.* at pp. 9-10. In their original state court petition, Plaintiffs also brought claims for loss of use, loss of enjoyment, diminution of property value, and emotional distress. These claims are absent from Plaintiffs' proposed pretrial order and suggested findings of fact and conclusions of law. As a result, these claims are abandoned. *Compare* R. Doc. 1 *with* R. Docs. 51 and 57.
[4] R. Doc. 51 at p. 10.

1

This matter was tried before the Court, sitting without a jury, on October 13-14, 2022.[5] The Court heard testimony from Behnaz Fahimipour, Mohamad Fahimipour, and UPC agent Jeff Lacombe, who was accepted by the Court as a qualified expert in the field of property insurance claims adjusting practices.[6] The Court admitted into evidence Exhibits 1-24.[7]

Having considered the testimony and evidence at trial, the arguments of counsel, and the applicable law, the Court now issues the following Findings of Fact and Conclusions of Law in accordance with Rule 52(a) of the Federal Rules of Civil Procedure. To the extent any findings of fact may be construed as conclusions of law, the Court adopts them as such. To the extent any conclusions of law may be construed as findings of fact, the Court adopts them as such.

## FINDINGS OF FACT

I. **Plaintiffs ordered, received, and read the home inspection report, which revealed significant property damage and liability hazards on the Property.**

In June 2020, Plaintiffs were in the market for a home and identified the Property as one they were interested in purchasing.[8] At a time unknown, but during June 2020 and before they purchased the Property, Plaintiffs ordered a building inspection report ("inspection report") from All American Inspections & Testing, LLC ("All American").[9] Behnaz Fahimipour chose All American to do the inspection on the basis of her internet research on the business.[10] Dan Paradela and Tina Baril, licensed home inspectors employed by All American, completed their inspection of the Property on Friday, June 12,

---

[5] R. Doc. 58 (minute entry); *see also* R. Doc. 59 (minute entry).
[6] R. Doc. 58 (minute entry); *see also* R. Doc. 59 (minute entry).
[7] R. Doc. 58 (minute entry).
[8] Behnaz Fahimipour testified to this fact.
[9] Behnaz Fahimipour testified to this fact. *See also* Trial Exhibit 11.
[10] Behnaz Fahimipour testified to this fact.

2020, at 11:00 a.m. and issued their report that same day.[11] The inspection report, 165-pages in length, was broken down into two main sections: (1) comments, accompanied by photographs of the condition of the Property illustrating the home inspectors' findings ("Comments");[12] and (2) the inspection report summary ("Report Summary").[13]

The 145-page Comments section reveals a bevy of damage to, and liability hazards on, the Property.[14] Relevant to the instant controversy, the inspectors found the following conditions existed at the time of inspection:[15]

- The Property is approximately forty years old.

- The landscaping soil, shrubs, and trees are too close to the building creating the potential for water infiltration, storm damage, structural damage, and insect infestation.

- The gutter downspout extensions are inadequate or missing, allowing water to collect at the foundation, and causing soil erosion.

- Penetrations in the brick veneer are improperly caulked, allowing pests and moisture to enter the building.

- Extensive damage to the rear patio tile floor is present from what appears to be settlement and/or foundation movement.

- All of the aluminum windows appeared operative, but are very old, have uninsulated single pane windows, and are very porous, allowing for air infiltration and moisture to enter the Property with wind-driven rain.

---

[11] Trial Exhibit 11. The two inspectors were not called as witnesses at the trial.
[12] *Id.* at BATES 270-413.
[13] *Id.* at BATES 414-431.
[14] *Id.*
[15] Beyond the conditions recounted here, many additional instances of property damage and liability hazards are identified in the inspection report.

3

- The exterior second floor balcony deck is in unacceptable condition as the balcony appears to hold water and is stained from puddles.

- Water stains and algae are present on the brick veneer on the exterior of the home from leaking gutters.

- The asphalt shingle roof: (1) is not in acceptable condition; (2) is very worn; (3) has deteriorated asphalt shingles caused by algae growth; (4) has asphalt granules that are falling away from the fiberglass shingles; (5) has several nail pops, loose shingles, and damaged shingles; (6) has excessive rust and damaged flashing on its penetrations; (7) has no flashing present between the asphalt shingles and brick veneer; and (8) has connected gutters holding water and full of debris.[16]

- A level survey of the foundation reveals a differential of approximately 5.3 inches.

- The chimneys are in unacceptable condition and the steel plates in the weather covers are rusting.

- Evidence exists of past and/or present roof leaks throughout the attic. Water stains are visible on roof sheathing, framing, and at some of the roof penetrations.[17]

- Damage exists at the front left and right corners and sides of the attic from what appears to be wood destroying organisms.

- There is a bird's nest in the damaged soffit at the Property's right rear corner.

---

[16] Thirty photographs accompany this comment.
[17] Nine photographs accompany this comment.

- Moisture stains are visible on backs of fascia board, and it appears the gutters are holding water, causing water to infiltrate behind drip edge flashing.

- Evidence exists of past and/or present roof leaks in the left rear corner and at the rear near of the attic space above the garage.[18]

- The 1983 General Electric two ton condenser unit located on the right side of the Property is not operative.

- Active plumbing leaks are noted behind the third floor right bathroom.

- Water is puddling on the attic floor and dripping from the second floor office room ceiling.

- Active plumbing leaks exist throughout the Property, including the second floor left bathroom and second floor right bathroom. Water stains exist on the second floor right bathroom ceiling.

- The first floor spa room shower appears to be leaking, and water is leaking on the floor near the wall behind this bathroom.

- Mold exists or is suspected in several areas in the building, including all four HVAC systems, under the sinks, at the six plumbing leaks, around windows, and in the attic space. The heaviest mold is noted in the spa room.

- Mold samples taken and sent to EM Lab P&K, an accredited national testing laboratory, reveal black toxic mold.

- The entire spa room requires complete renovation and mold remediation. Roof leaks and water intrusion in the spa room have caused damage to the

---

[18] Eleven photographs accompany this comment.

ceilings, walls, wood framing, and trim around the tub and windows. Active moisture is present in walls and ceilings around the tub.

- Loose wall paper and moisture stains exist in the first floor front left room.
- Moisture stains are present on the third floor hall ceiling, above the closet door.
- Water stains are present around a recessed light fixture hanging from the second floor left bedroom closet ceiling.
- Moisture stains are present on the den ceiling, though the stains are dry.
- Plumbing leaks are detected in several areas throughout the Property, which have caused water damage and mold growth.
- The second floor front left bathroom has water damage to the baseboards and lower walls behind the toilet and bidet.
- Water stains exist on the kitchen ceiling from plumbing leaks.
- Heavy mold growth exists in the sink base cabinet in the spa room.
- The carpeting throughout the house is worn and stained, scuff marks exist on the wood floors, a damaged wood floor plank exists in the den, dark stains exist on the flooring and carpeting near the second floor rear balcony doors, the flooring transition strip is loose at the guest bathroom, and a loose floor tile exists in the second floor font left bathroom.
- Horizontal cracks exist in the rear den wall.

The 18-page Report Summary summarizes the inspectors' extensive findings as follows:[19]

- The landscaping soil, shrubs, and trees are too close to the building, creating potential for water infiltration, storm damage, structural damage, and inspection infestation.

- The gutter downspout extensions are inadequate or missing, allowing water to collect against the foundation, and causing soil erosion.

- Penetrations exist in the brick veneer, allowing for pest and moisture infiltration.

- Cracks in the brick veneer exist in several areas around the house.

- All of the aluminum windows appear operative, but they are very old, uninsulated, very prone, and prone to air infiltration and moisture leaks with wind driven rain.

- Water stains and algae exist on the brick veneer from leaking gutters at the exterior of the Property.

- The exterior second floor balcony deck is in unacceptable condition—the balcony holds water and has extensive wood deck damage.

- The asphalt shingle roof is in unacceptable condition, is very worn, and appears to have algae growth, contributing to premature deterioration. The asphalt shingle roof has nail pops, loose shingles, damages shingles, excessive rust and damaged flashing on the penetration, and, in some instances, missing flashing.

---

[19] Trial Exhibit 11 at BATES 414-431. Beyond the conditions recounted here, many additional instances of property damage and liability hazards are identified in the Report Summary.

- The gutters hold water and are full of debris.
- The chimneys are in unacceptable conditions.
- A level survey of the foundation reveals a differential of approximately 5.3 inches, which is a high differential measurement.
- Evidence exists of past and/or present roof leaks throughout the attic.
- Moisture stains are visible on backs of fascia board in the attic.
- The 1983 General Electric two ton condenser unit located on the right side of the Property is inoperative.
- Active plumbing leaks exist throughout the house.
- Mold exists throughout the house.
- The entire spa room requires complete renovation and mold remediation because roof leaks and water intrusion has caused damage to ceilings, walls, wood framing, and trim around the tub and windows. A heavy mold odor exists in the spa room.
- Carpeting throughout the house is worn and stained, and the wood floors are damaged in part.
- Drywall joint cracks on ceilings and peeling wallpaper exists near the second floor rear balcony entrance.

On a date unknown, but before completing their application for insurance with UPC, Plaintiffs read the inspection report in whole or in part.[20] Behnaz Fahimipour testified she read the Report Summary before signing and submitting the couple's

---

[20] Plaintiffs testified to this fact at trial.

insurance application to UPC.[21] Mohammad Fahimipour testified he read the Comments and looked at the photographs[22] but did not read the Report Summary.

Plaintiffs were concerned enough about the findings of the inspectors to contact their real estate agent.[23] Plaintiffs did not contact either of the property inspectors.[24] Plaintiffs presented no evidence even remotely suggesting the inspection report, which Plaintiffs themselves ordered, was inaccurate in any of its particulars.[25] The Court makes a factual finding that the inspection report was accurate.

## II. Plaintiffs' application for insurance included a false statement made with knowledge of its falsity.

On June 28, 2020, Behnaz Fahimipour completed and signed the couple's application to UPC for insurance coverage on the Property.[26] Mr. Fahimipour was a co-applicant on the insurance application.[27] Behnaz Fahimipour signed the application on behalf of herself and her husband.[28] Behnaz Fahimipour testified that, while completing the application, she contacted UPC because she was concerned about the findings in the home inspection report. The remainder of Mrs. Fahimipour's testimony about what the UPC agent allegedly told her during that conversation is inadmissible hearsay, which the Court does not consider.[29] Mrs. Fahimipour was allowed to testify that a representative

---

[21] Behnaz Fahimipour testified at trial that she personally called UPC while completing the insurance application because of her concerns about the problems identified by the inspection report. If this were true, it would be additional evidence Behnaz Fahimipour was aware of the problems with the Property before submitting the application for insurance to UPC. *See also* Trial Exhibit 11 (the Report Summary begins on BATES 414 therein).
[22] Mr. Fahimipour testified he read the Comments and looked at the photographs, but not the Report Summary.
[23] Plaintiffs testified to this fact at trial.
[24] Plaintiffs testified to this fact at trial.
[25] Indeed, Mr. Fahimipour testified he relied on the inspection report to make repairs to the home after closing on the Property.
[26] Trial Exhibit 16.
[27] *Id.* at BATES 462.
[28] Behnaz Fahimipour testified to this fact at trial.
[29] At trial, UPC objected to Mrs. Fahimipour's testimony about her alleged conversation with UPC as hearsay, which objection the Court sustained.

9

of UPC told her it was permissible to certify the property free of damage on the insurance application because only minor, cosmetic damage existed. UPC's Jeff Lacombe testified (1) UPC has no records of such a phone call, (2) UPC's representatives are not permitted to advise applicants to that effect, and (3) the UPC underwriting file has no entry for this communication, which would exist had the conversation occurred. Mrs. Fahimipour's testimony was not credible. The Court finds that a representative of UPC did not inform Plaintiffs it was permissible for them to certify the property free of damage and liability hazards despite the findings in the inspection report.

On their application for insurance, Plaintiffs falsely certified the Property was "well maintained, and free of damage, debris, and liability hazards."[30] The applicants acknowledged they were "apply[ing] to [UPC] for a policy of insurance as set forth in th[e] application, on the basis of the statements contained [t]herein."[31] The application's acknowledgement section also included a "FRAUD STATEMENT: Any person who knowingly presents a false or fraudulent claim for payment of a loss or benefit or knowingly presents false information in an application for insurance is guilty of a crime and may be subject to fines and confinement in prison."[32]

The June 28, 2020 certification that the Property was "well maintained, and free of damage, debris, and liability hazards"[33] was made despite the Plaintiffs' knowledge of the findings in the June 12, 2020 inspection report. Both Plaintiffs had knowledge at the time the insurance application was submitted that the Property was not "free of damage . . . and liability hazards," contrary to their certification to UPC. Plaintiffs knowingly made a false statement on their insurance application.

---

[30] *Id.* at BATES 465.
[31] *Id.* at BATES 468.
[32] *Id.*
[33] *Id.* at BATES 465.

10

Plaintiffs' insurance policy with UPC was issued on July 6, 2022.[34] On July 20, 2020, Plaintiffs closed on the home.[35] Sometime thereafter, Plaintiffs, for the first time, began to repair the Property.[36] Thus, the damage and liability hazards on the Property identified in the June 12, 2020 inspection report remained on the Property when Plaintiffs' submitted their insurance application on June 28, 2020.

### III. Defendant would not have bound the policy had Plaintiffs not falsely certified the Property was "free of damage."

UPC agent Jeff Lacombe, who was accepted by the Court as a qualified expert in the field of property insurance claims adjusting practices, testified on behalf of Defendant that UPC routinely rejects applications when applicants answer "no" to the application question of "is the [dwelling] well maintained, free of damage, debris, and liability hazards?"[37] UPC would not have bound coverage for the Property had Plaintiffs been truthful on their application.

### IV. Plaintiffs are sophisticated users of insurance.

Plaintiffs are sophisticated:[38] Mr. Fahimipour is trained as a civil engineer and, in the past, has bought and purchased houses for renovation and resale; Mrs. Fahimipour is a pharmacist; Plaintiffs own multiple properties and have submitted insurance applications before; and Mr. Fahimipour is familiar with the homeowner's insurance claims process, having submitted a wind insurance claim in 2017, a wind and water insurance claim in 2016, and a water and plumbing insurance claim in 2015.

---

[34] *Id.* at BATES 462.
[35] Behnaz Fahimipour testified to this fact at trial.
[36] *See also* R. Doc. 51 (Plaintiffs' proposed findings of fact, stating "[a]fter moving into the home in July 2020, the Plaintiffs stated to make cosmetic modifications to update the home.").
[37] Jeff Lacombe testified at trial to this fact.
[38] Plaintiffs testified to these facts at trial.

11

## CONCLUSIONS OF LAW

The Court has subject matter jurisdiction over this matter pursuant to 28 U.S.C. § 1332, because the parties are completely diverse and the amount in controversy, exclusive of interest and costs, exceeds $75,000. Venue is proper because the Court has personal jurisdiction over UPC. *See* 28 U.S.C. § 1391 (b), (c). In this diversity case, the Court applies the forum state's substantive law.

Under Louisiana law, an insurance policy is voided entirely and from its inception when the insured makes a material misrepresentation in the application for insurance with the intent to deceive the insurer.[39] To void coverage under a theory of material misrepresentation in the insurance application, the insurer must prove by a preponderance of the evidence: (1) the insured made a false statement; (2) the false statement was material; and (3) the false statement was made with intent to deceive.[40]

In terms of the first element, Plaintiffs made a false statement on their insurance application. The Property was riddled with damage and liability hazards at the time Plaintiffs submitted their insurance application wherein they falsely certified the Property was "well maintained, and free of damage, debris, and liability hazards."[41] The first element has been proven by UPC by a preponderance of the evidence.

In terms of the second element, "[i]n order for the misrepresentations made by the applicant to be found material, they must have affected the risk assumed by the insurer."[42] Material "means that the statement must have been of such a nature that, had it been true,

---

[39] *Talbert v. State Farm Fire & Cas. Ins. Co.*, 971 So.2d 1206 (La.App. 4 Cir. 2007); *see also* La. R.S. 22:860.
[40] *Talbert*, 971 So.2d at 1212 (recognizing "[t]he jurisprudence of Louisiana is clear that an insurer must meet a three-tiered burden of proof in an action for denial of coverage for misrepresentation."); *see also Serie v. Safeway Ins. Co.*, 702 So.2d 778, 780 (La.App. 3 Cir. 10/8/97) (applying a "preponderance of the evidence" standard of proof).
[41] Trial Exhibit 16 at BATES 465.
[42] *Talbert*, 971 So.2d at 1213 (citing *Watson v. Life Insurance Co. of La.*, 335 So.2d 518, 522 (La.App. 1 Cir. 1976)).

the insurer either would not have contracted or would have contracted only at a higher premium rate."[43] At trial, UPC agent Jeff Lacombe testified UPC would not have bound coverage had Plaintiffs been truthful on their application and disclosed the condition of the property. The Court has accepted this testimony in its findings of fact. The second element also has been proven by UPC by a preponderance of the evidence.

In terms of the third element, Louisiana courts have not employed a strict proof of fraud standard to establish the insurance applicant's intent to deceive "'because of the inherent difficulties in proving intent.'"[44] Instead, "'[i]ntent to deceive must be determined from the surrounding circumstances indicating the insured's knowledge of the falsity of the representations made in the application *and* his recognition of the materiality of his representations, or from circumstances which create a reasonable assumption that the insured recognized the materiality.'"[45] In terms of knowledge of the false representation, at the time Plaintiffs submitted their insurance application they included a false certification, signed by Mrs. Fahimhipour, that the Property was free of damage and liability hazards, Plaintiffs knew the certification was false based on the June 12, 2020 inspection report that they ordered, reviewed, and read.[46] As it relates to recognition of the materiality of their representation, because the Plaintiffs are both sophisticated users of insurance with experience with property ownership, insurance application, and insurance claims, the Court finds, as a matter of law, a reasonable assumption may be reached that Plaintiffs recognized the materiality of their misrepresentation to UPC. As a result of Plaintiffs' knowledge of the falsity of their

---

[43] *Id.* (citing *West v. Safeway Insurance Co. of La.*, 954 So.2d 286, 290 (La.App. 2 Cir. 2007)).
[44] *Id.* (quoting *Cousin v. Page*, 372 So.2d 1321, 1233 (La. 1979)).
[45] *Id.* (quoting *Cousin*, 372 So.2d at 1233).
[46] *See supra* Findings of Fact, Part II.

13

representation and recognition of its materiality, the third element—intent to deceive UPC—has been proven by UPC by a preponderance of the evidence.

## CONCLUSION

Based on the above findings of fact and conclusions of law, the Court finds by a preponderance of the evidence that Plaintiffs made a material misrepresentation in their application for insurance with the intent to deceive UPC, thereby voiding entirely and from its inception the insurance policy that forms the basis of their lawsuit. Because all claims for relief asserted by Plaintiffs are predicated on the existence of an insurance contract, which the Court has found does not exist, Defendant is entitled to judgment in its favor on all claims brought by Plaintiffs.[47] The Court will enter a judgment to that effect by separate order.

**New Orleans, Louisiana, this 9th day of November, 2022.**

*[signature: Susie Morgan]*

**SUSIE MORGAN**
**UNITED STATES DISTRICT JUDGE**

---

[47] Defendant argues Plaintiffs are not entitled to recovery for reasons beyond their material misrepresentation on their insurance application. The Court need not reach those issues to find Plaintiffs are not entitled to recovery.